IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 4, 2000 Session

## MICHAEL HOLMES v. JENNIFER L. WILSON, ET AL.

Appeal from the Circuit Court for Wilson County
No. 9792     John D. Wootten, Jr., Judge

No. M1999-01087-COA-R3-CV - Filed April 12, 2001

This is an appeal from an order granting summary judgment to Jennifer Wilson and Car City, Inc. The case arises from an automobile collision between a vehicle driven by Mr. Holmes and a vehicle driven by Ms. Wilson while in the course and scope of her employment with Car City. The vehicle Ms. Wilson was driving had been purchased by Car City from Cumberland City Dodge on the day of the accident. The accident was caused by a mechanical failure, causing Ms. Wilson to lose control. The trial court found that the defendants had made a reasonable inspection of the vehicle prior to the accident and granted summary judgment. Mr. Holmes appeals the standard of care applied by the trial court and the sufficiency of the evidence that a reasonable inspection was performed. Because the defendants owed only the duty to make a reasonable inspection of the vehicle, and the undisputed evidence establishes that a reasonable inspection was made, we affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
### Affirmed and Remanded

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S. and WILLIAM C. KOCH, JR., J. joined.

Larry L. Roberts, Nashville, Tennessee, for the appellant, Michael Holmes.

Lora A. Barkenbus, Nashville, Tennessee, for the appellee, Jennifer L. Wilson, et al.

### OPINION

This case arises from an automobile collision on I-40 near Lebanon, Tennessee between a vehicle driven by Ms. Wilson and a vehicle driven by Mr. Holmes. Ms. Wilson was an employee and agent of Car City, Inc., driving a 1986 Oldsmobile owned by Car City from Cookeville to Nashville at the time of the accident. Car City, Inc. is a middle-man wholesaler of used cars in Nashville. Car City purchases cars traded in to new car dealers in outlying areas and then, in turn, sells the vehicles to retail used car businesses. The car driven by Ms. Wilson was purchased by Car

City, through its agent Scott Munson, from Cumberland City Dodge in Cookeville, Tennessee, and was being driven to Nashville for re-sale.

At the time of the purchase, Mr. Munson visually inspected the vehicle, listened to the car and test drove the car. He did not notice or detect any defects or problems with the vehicle. Mr. Munson has approximately eight years of experience in buying and selling used cars as a wholesaler. The car also underwent another test drive from the dealership to the interstate entrance ramp by Denny Harris. Mr. Harris has mechanical experience in rebuilding clutches, brakes and motors. However, he is not a certified mechanic. During the few blocks he drove the vehicle, he did not notice any problems or defects with the vehicle.

At the on-ramp to I-40, Ms. Wilson took over driving the Oldsmobile, after switching vehicles with Mr. Harris. Ms. Wilson proceeded to drive the vehicle approximately 50 miles to Lebanon, Tennessee without any problems. Then, she lost control of the vehicle, crossed the median, and struck the car driven by Mr. Holmes. She testified in her deposition as follows:

Q: Why don't you just go ahead and tell me in your own words how the accident occurred?

A: Okay. We were driving down the interstate and the car veered off to the left. So I tried to get it back up on the road. I couldn't. It would not turn at all. I had no control. All I remember is going through the grass median, coming up on the other side of the interstate. And I looked through the passenger window up front, and all I could see coming at me was a jeep that didn't have a top on it. And all I remember was thinking I'm going to die and he's going to die, too.

Q: Did you have any idea why you could not control the car?

A: No, ma'am.

Q: Just prior to the wheel allegedly coming off, did you notice the car driving strangely at all or any kind of problem with the car? Was it driving rough or unstable?

A: No ma'am.

Q: So, then, as far as you know, or from what you believe, the axle suddenly broke with no warning whatsoever?

A: Yes, ma'am.

Mr. Holmes, who was driving the vehicle Ms. Wilson collided with, sued Ms. Wilson, Car City, Inc. and Bill Chism d/b/a Car City for the negligent acts of Ms. Wilson while in the course and

2

scope of her employment with Car City.[1] Mr. Holmes alleged that he suffered injuries due to Ms. Wilson failing to properly control her vehicle, negligently driving her vehicle across the median into oncoming traffic, speeding, failing to keep a proper lookout for other vehicles and generally driving her vehicle in a negligent, careless, hazardous and dangerous manner.

The defendants filed a motion for summary judgment asserting that the accident was caused by a broken axle, not any negligent operation of the vehicle by Ms. Wilson, and that the car had been reasonably inspected prior to her driving it from Cookeville. Mr. Holmes opposed the motion and argued that the wheel coming off the car was the consequence, not the cause, of the accident. The trial court denied summary judgment because there existed a disputed fact as to whether the broken axle caused Ms. Wilson to lose control or whether the axle broke as a result of her negligence in losing control of the car.

Subsequently, the defendants filed another motion for summary judgment, including the deposition of a witness to the accident whom they had located since the first motion. John T. Baugh, Jr. was driving behind Ms. Wilson and saw the accident and what happened to Ms. Wilson's vehicle prior to the accident. Mr. Baugh was presented as possessing substantial expertise in automobile and aircraft mechanics.[2] He is not in any way connected to any of the parties in this case. He testified that he was familiar with what happened mechanically to the car. He stated the accident happened because the axle broke and slid out of place, causing the wheel to fall off.[3] This sent the car out of control, colliding with oncoming traffic. He was unequivocal in stating that Ms. Wilson was driving safely and that she tried to maintain control of the car after the wheel came off. He stated that a driver would have no notice that the axle was sliding out until the wheel separated from the car. He also stated that by the time the wheel came off and the car started sliding, the driver was essentially "a passenger" and there was nothing she could do.

Mr. Baugh testified that as he was driving along the interstate, Ms. Wilson was fifty to seventy-five feet in front of him. He first noticed that the left rear tire of the car she was driving was two inches outside the fender. As he continued to watch, he saw the wheel "ease on out," and when the wheel left the housing, the car fell down, skidded across the median, and into oncoming traffic. "The wheel finally came away from the car, attached with the axle. It brought the axle with it, which means it turned loose in the rear of the car. And there's a gear back there called a pinion gear. And

---

[1]Due to the death of Bill Chism, the plaintiff entered an order of voluntary non-suit without prejudice against him but maintained the causes of action against Ms. Wilson and Car City.

[2]Mr. Baugh serves as the Chairman and Chief Executive Officer of Centurion Products; the Chairman of the Bureau of Aeronautics for the State of Tennessee; National Director of Experimental Aircraft Association; Director of the Division of Warbirds of America. Additionally, his father was a mechanic and he has grown up fixing cars. He also enjoys restoring airplanes and antique vehicles as a hobby.

[3]The car was not retained by the defendants after the accident and was, therefore, not available for inspection. In fact, it had never been inspected by Mr. Baugh or anyone else connected to this case.

that obviously failed or let go and let this axle come loose." He also testified that the pinion gear is enclosed in the sealed differential housing.

Mr. Holmes was unable to offer any evidence to rebut this testimony, and apparently does not dispute on appeal that Ms. Wilson lost control of the car because the rear axle came loose and the left rear wheel suddenly fell off.

In their second motion for summary judgment, supported by the deposition of Mr. Baugh, the defendants asserted that the collision was caused by a defective latent condition and that the vehicle was reasonably inspected prior to the accident. Mr. Baugh, whom even Mr. Holmes describes as having considerable expertise in automobile and aviation mechanics, was asked in his deposition, "If a person had jacked that car up in a garage before the gear failed inside the differential housing, would just looking at the differential and the rear axle have told you whether or not there was a problem inside that?" He answered, "No way, no visible cue at all." He later clarified that answer:

Q: Now, you said before if the automobile that Miss Wilson was driving had been inspected before this accident that there would have been no visible way to tell that this was going to occur; is that right?

A: Well, that's my opinion. There's no way to look at the axle, even on my car. Lay down on the ground and look at it, there's no way to tell visually.

To clarify that, if you looked up and saw a crack in the housing or saw a plug where they put the grease in was leaking. I mean, it's not uncommon, I guess, where you go get them greased at that someone could spot something.

But that's a sealed housing. It has sealed bearings on each end that retain the grease throughout that system that's in the back. If there was a crack, you would lose the grease. Then somebody would see that there's been a drip in the driveway. Not necessarily a drip, but a pretty good puddle.

But if you lost it on the highway, if this cracked on the highway, and you lost all the grease, you still wouldn't know it. You would be driving along until it failed, because you would have metal against metal. So it's a possibility this thing could have happened way back up the road somewhere, lost its grease from a crack, or failure is another word for it. I don't know.

Yes, there is another way. When its on – if it's on jacks or up on a lift, a mechanic can take and pull back and forth on the wheel to see if there's any – we call it slop – but any play. And if there's play in it, in that [pinion] gear, then that's not visual. That's only by feeling. And a qualified mechanic could do that.

Essentially, the pinion gear, inside a sealed housing and not visible, failed, probably due to lack of lubricant. If the grease normally in the housing had leaked because of a crack, it may have been possible to see the crack or a puddle of grease. However the crack could have developed and the grease run out during the fifty mile drive on the interstate. The witness made it clear that even the inspection of the car on a lift by a certified mechanic, however, would not have revealed any defect if the defect developed during the trip, which was also a likely possibility. The court granted the defendants' motion for summary judgment and found that the accident occurred after the axle broke, that this was an unforeseeable mechanical failure, and that the defendants made a reasonable inspection of the vehicle prior to driving it.

Mr. Holmes appeals this decision asserting that the court applied the wrong duty of care owed by the defendants, that the evidence is insufficient to establish the defendants performed a reasonable inspection, and that the evidence is insufficient to establish the defect was latent. For the reasons below, we affirm.

I.

A trial court's grant of a motion for summary judgment presents a question of law that we review *de novo* without a presumption of correctness. *Goodloe v. State*, 36 S.W.3d 62, 65 (Tenn. 2001); *Mooney v. Sneed*, 30 S.W.3d 304, 306 (Tenn. 2000). We must determine whether there is no genuine and material factual issue, and, then, whether the movant is entitled to judgment as a matter of law. *Id*. In making this determination, we view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in their favor, affirming the summary judgment only when the facts and inferences permit a reasonable person to reach but one conclusion. *Id*.

II.

A plaintiff's first burden in a negligence action is to establish that the defendant owed the plaintiff a duty of care and breached that duty. *Rice v. Sabir*, 979 S.W.2d 305, 308 (Tenn. 1998). The nature and scope of a duty in particular circumstances is a question of law to be decided by the court. *Blair v. Campbell*, 924 S.W.2d 75, 78 (Tenn. 1996).

Mr. Holmes argues that Car City should be held to the standard applicable to sellers of used cars to the public, and also argues that we should adopt the higher standard used in some other states rather than that apparently established in Tennessee.[4] Car City and Ms. Wilson, however, assert that in this case Car City was the purchaser, not the seller, of the car. Therefore, they argue, the standard for used car dealers, which is based upon the superior knowledge of a business selling used cars to

---

[4]Mr. Holmes cites several cases from other jurisdictions dealing with the duty of a seller of a used vehicle to a member of the public. *Hembree v. Southhard*, 339 P.2d 77 (Okla. 1959); *Bock v. Truck & Tractor, Inc.*, 139 P.2d 706 (Wash. 1943); *Foley v. Harrison Ave. Motor Co.*, 883 P.2d 100 (Mont. 1994); *Jones v. Ramey Chevrolet Co.*, 9 S.E.2d 395 (N.C. 1940); *Kopischke v. First Continental Corp.*, 610 P.2d 668 (Mont. 1980). These cases deal with the sale of a used car by a used car dealer to a consumer who is a member of the general public.

the ordinary consumer or general public, does not apply to the defendants in the fact situation presented herein. Instead, they assert that the standard of care to be applied to them is that applicable to ordinary drivers who operate vehicles on public streets and highways.

Tennessee has established the duty of care applicable to used car dealers. In *Patton v. McHone,*[5] 822 S.W.2d 608 (Tenn. Ct. App. 1991), this court held:

> used cars are more likely to have mechanical defects than new ones and that used car dealers are in a better position to discover these defects than their average customer.
>
> While used car dealers are not insurers of the cars they sell, they have the duty to make a reasonable inspection of a vehicle to discover defects or conditions that could render the car defective or dangerous.
>
> The duty to inspect, however, does not extend to the discovery of latent defects that could not be discovered during a reasonable inspection. Therefore, used car dealers are not required to disassemble the entire car or to examine each of its component parts. In the absence of actual knowledge of a defect, a used car dealer is entitled to rely on a test drive or on the validity of a current safety inspection sticker.

*Id*. at 614 (citations omitted).

Mr. Holmes asserts that the duty established in *Patton v. McHone* is *dictum* and that we should adopt a standard requiring used car dealers to conduct "a reasonable, brief visual and/or testing inspection."[6] We are not convinced that the standard espoused by Mr. Holmes is, in practical application, greatly different from the *Patton* requirement that dealers "make a reasonable inspection of a vehicle to discover defects or conditions that could render the car defective or dangerous." Mr. Holmes primarily objects to an interpretation of *Patton* suggesting that a test drive constitutes a reasonable inspection. However, the facts in this case indicate that, in addition to the test drives conducted on this vehicle, other inspections were made.

We need not determine whether those inspections, along with the test drives, were reasonable under *Patton* or the standard espoused by Mr. Holmes, however, because Car City was not a used car retailer who sold a car to an ordinary customer; instead, it was a purchaser. It had just bought

---

[5]In *Patton*, the purchasers of a used vehicle were suing for rescission of their purchase and other remedies relating to their business transaction; it was not a tort case. Nevertheless, the standard, or duty of care, of a used car dealer to inspect a vehicle it sells, as established in *Patton,* is derived from the dealer's superior knowledge and capability to inspect the vehicle for safety as well as performance. That duty is applicable to used car dealers regardless of whether the cause of action sounds in tort, contract or otherwise.

[6]Mr. Holmes describes such an inspection as not requiring a dealer to disassemble a car or to conduct sophisticated tests. "All that would be required is that the dealer briefly visually inspect the parts that are essential for safety . . . and to physically manipulate those parts when necessary."

the Oldsmobile involved in the accident, intended to sell it to a used car retailer, and was transporting it to Nashville. Thus, the question is what duty did the Car City employees have before they took the car onto the public highways? It is the same duty other drivers have when operating a vehicle on public highways.

Generally, those who operate vehicles on public highways have a duty to take the care reasonably necessary to protect other users of the highways from foreseeable harm. The duty of a driver using the public highways "arises from obligations imposed on every man to refrain from acts which he may reasonably expect to result in injury." *Alexander v. Walker*, 15 Tenn. App. 388, 393 (1932). In *Alexander,* this court applied that general standard to a lessor of cars for "temporary hire," stating:

> One who lets automobiles for use in public must exercise ordinary care to avoid letting a machine with defects which may injure persons coming in contact with it notwithstanding the fact that an automobile is not per se a dangerous instrumentality; but this duty does not rest upon contract of bailment but arises from obligations imposed on every man to refrain from acts which he may reasonably expect to result in injury.

> . . . We intend only to hold that he must exercise reasonable diligence to know the condition of his machines before letting them into the hands of drivers for use on the highways.

*Id*. (citations omitted).

"The law requires the driver of a motor vehicle to exercise ordinary or reasonable care to avoid injury to the persons or property of others lawfully using the highway." *Smith v. Fisher*, 11 Tenn. App. 273, 279 (1929). Ordinary care is "[t]hat degree of care which an ordinarily prudent and competent person engaged in the same line of business or endeavor should exercise under similar circumstances. . . . [and] must be viewed in the light of all the surrounding circumstances, as shown by the evidence in the case." BLACK'S LAW DICTIONARY, 1097-98 (6th ed. 1990). *See also Roberts v. Robertson County Bd. of Educ.*, 692 S.W.2d 863, 869-70 (Tenn. Ct. App. 1985).

With regard to the condition of a vehicle operated on public highways, the generally applied rule is that the owner or operator of a motor vehicle has a duty to see that it is in a reasonably safe condition before operating it on a public highway. 60A C.J.S. *Motor Vehicles* § 260 at 95 (1969); *Phillips-Buttorff Mfg., Co. v. McAlexander*, 15 Tenn. App. 618 (1932). An owner of a vehicle has a duty to maintain the vehicle in a reasonably safe condition. *Foley v. Harrison Ave. Motor Co.*, 883 P.2d 100, 103 (Mont. 1994). One driving a strange car for the first time owes a duty to the public to see that there are no obvious defects in its mechanism which may cause injury to others. 60A C.J.S. *Motor Vehicles* § 260 at 99.

In Tennessee, there is no liability of a driver of a vehicle for damages resulting from a mechanical failure "due to a latent defect of which he had no knowledge and of which he would not have acquired knowledge in the exercise of due care." *Williams v. Pritchard*, 43 Tenn. App. 140, 143, 306 S.W.2d 46, 48 (Tenn. Ct. App. 1957); *Sloan v. Nevil*, 33 Tenn. App. 100, 112, 229 S.W.2d 350, 356 (Tenn. Ct. App. 1949). In a more recent opinion, this court affirmed the continuing validity of this standard in a case where an employer-owner and an employee-driver defended a negligence action, in part, on the basis the accident was caused by a defective power steering gear, which was a latent defect that a reasonable inspection would not have disclosed. *See Parker v. Prince*, 656 S.W.2d 391 (Tenn. Ct. App. 1983). The trial court instructed the jury that the defendants must prove "that the truck was in good mechanical condition and [the accident happened] because of some latent defect in the steering mechanism, unknown to the driver and owner and one which could not have been discovered in the exercise of reasonable care and reasonable inspections." *Id*. at 398. The court further charged:

> That is, if the steering mechanism had previously functioned properly and suddenly and without warning failed to function, the failure does not, in the absence of knowledge of the defect or on such reasonable inspections as would have led one in the exercise of due diligence to discover it, impose liability upon the owner.

*Id*. at 398. The trial court, however, concluded the latent defect part of the jury charge with an instruction that the doctrine of latent defect should be considered with caution. *Id*. at 398. On appeal, this court held that this charge was error, holding, "A defense based on 'latent defect' is a perfectly valid defense and is entitled to be considered by the jury in the same light as any other defense." *Id.* at 398.

This standard is consistent with the general statement of the majority view that, "Where ordinary care is exercised, the mere fact that an injury results because of some defect in the vehicle does not establish the negligence of the operator, as where the operator is excusably ignorant of the defects . . ." 60 C.J.S. *Motor Vehicles* § 260 at 97; *Williams v. Pritchard*, 306 S.W.2d at 48; *Lively v. Atchley*, 36 Tenn. App. 399, 403, 256 S.W.2d 58, 59 (Tenn. Ct. App. 1952); *Coppedge v. Blackburn*, 15 Tenn. App. 587, 596, (1932). As with other actions involving allegations of negligence, the ultimate test is whether the injuries were reasonably foreseeable by someone using due care under the circumstances. *See Dillard v. Vanderbilt Univ.*, 970 S.W.2d 958, 960 (Tenn. Ct. App. 1998) (if the injury could not have been reasonably foreseen, no duty to prevent it arises.)

III.

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material facts and the moving party is entitled to a judgment as a matter of law. Tenn. R. Civ. P. 56.04; *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997); *Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn. 1995); *Byrd v. Hall*, 847 S.W.2d 208, 214 (Tenn. 1993). Thus, the summary judgment herein should be affirmed if the undisputed facts reasonably support only one conclusion - that Ms. Wilson

and Car City are entitled to a judgment as a matter of law. *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995); *Carvell v. Bottoms*, 900 S.W.2d at 26.

The cause in fact of the accident herein was the loss of a rear wheel, which, the undisputed proof shows, happened because the differential housing likely cracked, causing the pinion gear to fail and to let the axle come loose. Mr. Holmes no longer contends that anything other than the wheel coming off was the immediate cause of the accident.

When faced with defendant's second motion for summary judgment, Mr. Holmes had the burden of producing evidence to contradict the allegations that a defective latent condition had led to the sudden loss of the wheel and that the vehicle had been reasonably inspected prior to its being driven on the interstate. Mr. Holmes was required to set forth specific facts, not legal conclusions, to establish disputed issues that are material to the resolution of the case. *Byrd*, 847 S.W.2d at 215. A disputed fact is material for summary judgment purposes if it must be decided in order to resolve a substantive claim or defense underlying the summary judgment motion. *Id*.

Mr. Holmes produced no evidence regarding how or why the housing cracked, because there was no inspection of the car after the accident. The eyewitness, knowledgeable in mechanics, stated that it is impossible to know whether the housing cracked before or after Ms. Wilson drove the car on the interstate. Mr. Holmes has produced no evidence that the defect actually existed at the time the Car City employees inspected and test drove it. He merely argues that if there had been certain indications of the problem (e.g., a visible crack in the housing), a more thorough examination of the car could possibly have revealed them. Those allegations are not sufficient.[7]

Because defendants owed only the duty to exercise ordinary care, including the duty to exercise due care to discover defects, the only remaining question is whether the inspections and test drives performed on the vehicle prior to its being driven on the interstate were reasonable. There is no dispute about the inspections and test drives conducted and no dispute that Ms. Wilson drove the car for approximately fifty miles on the interstate, with no indication of a problem, before the wheel fell off.

In *Alexander*, the court held that there was no proof of neglect of the duty to inspect, and therefore no liability, because there was proof plaintiff drove the car approximately "two and one-half miles before the accident happened;" there was "no proof the automobile was defective or shimmied before it left the garage;" an employee of defendant "examined the car and filled it with oil and gasoline before it was let to Mr. Courtney and [said] that it was in good condition;" and "others who drove the car immediately before the accident said there was nothing the matter with it and it was in good condition." 15 Tenn. App. at 393-94. The facts before us are similar. Mr. Munson, listened to the engine and visually inspected the vehicle. The car driven by Ms. Wilson

---

[7]There is no evidence the car was defective before it left Cumberland Dodge. We cannot draw any inference that had a further inspection been conducted, any defect would have been discovered.

had also been driven a short distance by Mr. Munson and Mr. Harris and approximately fifty miles by Ms. Wilson before this accident occurred.

Mr. Holmes argues that the inspections and test drives performed by the Car City employees were not reasonable under the circumstances, but his only basis for that assertion is that there was no inspection or observation performed by a "qualified person." Mr. Holmes relies on Mr. Baugh's statements that if the car were put up on a lift, someone who worked at a place which greases cars could spot a crack in the housing or a leaking plug, if one existed. In addition, he stated that if the car were on a lift a qualified mechanic could check for "play" in the pinion gear by pulling the wheel back and forth. We do not think that the duty to make a reasonable inspection, which can consist of a test drive, requires such measures. We decline to hold that a driver about to take a used car, even a newly-acquired used car, on the public highways is required to first have the car inspected on lifts by a certified mechanic. Having refused to so conclude, we must necessarily find that the inspection by the Car City employees, including the test drives, was reasonable.

Because the undisputed proof establishes that the defendants did not breach the duty of care they owed the plaintiff, summary judgment was proper as a matter of law.

IV.

For the reasons stated above, we affirm the trial court's grant of summary judgment for the defendants. Costs of this appeal are taxed to Mr. Holmes.

_____
PATRICIA J. COTTRELL, JUDGE